WP4

07 CV 6339

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### WHITE PLAINS DIVISION

RECEIVED

JUL 1 1 2007

U.S.D.C. S.D.N.Y.
CASHIERS

| | |
|---|---|
| NORMAN LEVY, Derivatively on behalf of ITT INDUSTRIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> STEVEN R. LORANGER, CURTIS J. CRAWFORD, CHRISTINA A. GOLD, RALPH F. HAKE, JOHN J. HAMRE, RAYMOND W. LEBOEUF, FRANK T. MACINNIS, LINDA S. SANFORD, and MARKOS I. TAMBAKERAS, <br><br> Defendants, <br><br> vs. <br><br> ITT INDUSTRIES, INC., an Indiana Corporation, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION NO.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

JURY TRIAL DEMANDED

Plaintiff, by his undersigned attorneys, alleges for his Verified Shareholder Derivative Complaint, based upon, <u>inter alia</u>, the investigation made by and through his attorneys, as follows:

## SUMMARY OF ACTION

1.    This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant ITT Industries, Inc. ("ITT" or the "Company") against its Board of Directors and senior current and former officers for their breaches of fiduciary duty, gross mismanagement and other unlawful acts.

2.    As a direct result of defendants' actions, ITT through its subsidiary, ITT Night Vision ("ITT NV"), has systematically and intentionally violated Federal laws and regulations, including the 1976 United States Arms Export Control Act ("AECA") and the International Traffic in Arms Regulations ("ITAR"), culminating in numerous criminal investigations and the subsequent prosecution of ITT by several United States agencies. Thus, as a result of defendants' actions, ITT has been forced to pay over $100 million in fines, and has been exposed to significant criminal and civil liability. Absent judicial intervention, defendants will not take the actions requested herein, and, in the continued breach of their fiduciary duties, will persist in allowing the wrongdoers to escape justice and ITT's injuries to remain uncompensated.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States. This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, many of the acts alleged and complained of occurred in this District, where ITT maintains its principal executive offices.

## THE PARTIES

5.    Plaintiff has owned shares of ITT at all times relevant herein.

6.    ITT is a corporation duly organized and existing under the laws of the State of Indiana and maintains its headquarters at 4 West Red Oak Lane, White Plains, New York 10604. The Company, through its divisions and subsidiaries, is engaged in the design and manufacture

of a wide range of engineered products and related services comprised of three principal segments: Fluid Technology; Defense Electronics & Services; and Motion & Flow Control. The Defense Electronics & Services division accounted for 47% of ITT's $7.81 billion in sales in 2006 and 50% of operating profit.

7.      Defendant Steven R. Loranger ("Loranger") has served as President, Chief Executive Officer and Chairman of the Board of Directors of ITT since 2004.

8.      Defendant Curtis J. Crawford ("Crawford") has served as a director of ITT since 1996. Crawford serves on the Compensation and Personnel Committee, and acts as the Chair of the Corporate Responsibility Committee. He currently serves as President and Chief Executive Officer of XCEO, Inc., and was President, Chief Executive Officer and Chairman of ZiLOG, Inc. Defendant Crawford is a director of E.I. DuPont De Nemours and Company, ON Semiconductor Corporation, and Agilysys, Inc.

9.      Defendant Christina A. Gold ("Gold") has served as a director of ITT since 1997. Gold serves on the Audit Committee and Corporate Responsibility Committee. She is Senior Executive Vice President of First Data Corp., and President of Western Union Financial Services, Inc. Gold currently serves as a director of New York Life Insurance Company and the Torstar Corporation.

10.     Defendant Ralph F. Hake ("Hake") has served as a director of ITT since 2002. Hake serves on the Nominating and Governance Committee and acts as the Chair of the Audit Committee. Since 2001, Hake has been Chairman and Chief Executive of Maytag Corporation (acquired by Whirlpool Corporation in 2006).

11.    Defendant John J. Hamre ("Hamre") has served as a director of ITT since 2000. Hamre serves on the Audit Committee and Corporate Responsibility Committee. He is also President and Chief Executive Officer of the Center for Strategic & International Studies and served as United States Deputy Secretary of Defense. Hamre is a director of MITRE Corporation, Choicepoint, Inc. and SAIC, Inc.

12.    Defendant Raymond W. LeBoeuf ("LeBoeuf") has served as a director of ITT since 2000. LeBoeuf serves on the Audit Committee and Nominating and Governance Committee. He was Chief Executive Officer, Chairman and a director of PPG Industries. He currently serves as a director of Praxair, Inc.

13.    Defendant Frank T. MacInnis ("MacInnis") has served as a director of ITT since 2001. MacInnis serves on the Compensation and Personnel Committee and acts as Chair of the Nominating and Governance Committee. He is Chairman and Chief Executive Officer of EMCOR Group, Inc. He is also a director of the Williams Companies, Inc. and ComNet Communications, LLC.

14.    Defendant Linda S. Sanford ("Sanford") has served as a director of ITT since 1998. Sanford serves on the Compensation and Personnel Committee and Nominating and Governance Committee. She is Senior Vice President of International Business Machines' Enterprise On Demand Transformation and Information Technology division.

15.    Defendant Markos I. Tambakeras ("Tambakeras") has served as a director of ITT since 2001. Tambakeras serves on the Corporate Responsibility Committee and acts as Chair of the Compensation and Personnel Committee. He is Executive Chairman to the Board of Directors of Kennametal Inc. Tambakeras also serves on the Board of Parker Hannifin

4

Corporation, is Chair of the Manufacturers Alliance Board of Trustees and is a member of the President's Manufacturing Council.

16.    (a)    The defendants, by reason of their status as officers and executives or members of the ITT Board of Directors have and had the power and influence and did in fact control and influence and cause ITT to engage in the unlawful acts and conduct complained of herein. Each of the defendants is liable as a direct participant in, and aider and abetter of, the wrongs complained of herein.

(b)    By reason of their positions and because of their ability to control the business and corporate affairs of ITT at all relevant times, the defendants owe and have owed ITT and its shareholders the highest fiduciary obligations of fidelity, trust, loyalty, and due care, and were and are: required to use their utmost ability to control and manage ITT in a fair, just, and equitable manner; act in furtherance of the best interests of ITT and its shareholders so as to benefit all shareholders and not in furtherance of their personal interest or to benefit themselves; and act with complete candor toward the public shareholders. In addition, each director of ITT owes and has owed to ITT and its shareholders the fiduciary duties to exercise due care and diligence in the administration of the affairs of ITT and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

17.    The defendants who are members of the Board of Directors of ITT are charged with numerous responsibilities in managing the Company's everyday business and affairs. Specifically, as set forth in the Company's Proxy Statement, filed with the SEC on April 4, 2007 (the "2006 Proxy"), those responsibilities include assuring that management develops sound business strategies, the Company's systems of financial reporting and internal controls are

5

adequate and properly implemented, and the Company's businesses are conducted in conformity with applicable laws and regulations.

18.    The defendants serving on the Company's Audit Committee, including defendants Hake (Chairman), Gold, Hamre, and LeBoeuf, are charged with specific oversight responsibilities. As set forth in the 2006 Proxy, those responsibilities include assisting the Board in fulfilling its responsibilities for general oversight of the Company's accounting methods and procedures, review with management of the effect of regulatory and accounting initiatives on the Company's financial statements, and review and monitoring of the adequacy of the Company's internal control systems and their effectiveness.

19.    The defendants serving on the Corporate Responsibility Committee, including defendants Crawford (Chairman), Gold, Hamre, and Tambakeras, are charged with specific oversight responsibilities. As set forth in the Company's 2006 Proxy, those responsibilities include regular assessment of the Company's programs and policies for effective compliance with legal and regulatory requirements.

20.    ITT's non-employee directors receive lucrative compensation for their service on ITT's board. In 2005, the Company's non-management directors received an annual retainer of $50,000 payable in restricted stock, $25,000 in lieu of meeting fees, payable at the election of each director, in cash, deferred cash or additional restricted stock and a stock option award valued at $25,000. Effective December 1, 2005, however, the Board of Directors of ITT approved substantial pay raises for themselves. As approved, non-employee directors receive total annual compensation in the amount of $180,000. Of this amount $50,000 is payable in cash or deferred cash, two thirds of the remainder in restricted shares and one third of the remainder in

6

non-qualified stock options. In addition, a supplemental retainer of $10,000 in cash is paid to the Audit Committee Chair, effective as of the Company's 2006 annual meeting.

21.    The defendants, because of their positions of control and authority as executive officers and/or directors of ITT, were able to and did, directly and indirectly, control the matters and transactions complained of herein. These defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company to strictly comply with all applicable laws and regulations, provide the highest quality services, and maximize the profitability of the Company, for the benefit of its shareholders.

## SUBSTANTIVE ALLEGATIONS

22.    ITT, through its ITT NV subsidiary, in collaboration with United States government engineers and scientists, has produced night vision equipment for the United States military and its allies. For reasons of national security, the export of important military equipment, such as military night vision equipment, including the technical data, drawings, specifications, and services related to military night vision systems, which in certain cases is protected as classified information, is substantially restricted by the United States Congress pursuant to the AECA and by the United States Department of State pursuant to the ITAR.

23.    ITT, however, flouted those laws and failed to establish a system designed to ensure compliance. Throughout the 1990's and until early 2006, ITT employees who attempted

to enforce compliance with the ITAR regulations were viewed by managers as obstacles to the business. ITT managers repeatedly ordered their employees to conduct equipment transfers of sensitive military equipment without a license authorizing such transfers, as required by the AECA. In one instance, when an employee complained to appropriate personnel regarding illegal transfers ordered by a manager, that manager, rather than being reprimanded, was promoted to a position responsible for ITT's compliance with the ITAR regulations.

**Consignment-related Violations**

24.    As a regular part of its foreign business practices, ITT temporarily loaned or consigned various export controlled night vision equipment to foreign customers for evaluation and testing. In order to consign export controlled night vision equipment to a foreign person, ITT was required to obtain a temporary export license from the Department of State, Office of Defense Trade Controls Licensing, authorizing each foreign consignment. Each export license for the foreign consignments required ITT to ensure that the consigned night vision equipment was returned by the foreign consignee to ITT in the United States before the expiration of the four year license period.

25.    Throughout the 1990's, ITT failed to ensure that a substantial amount of sensitive night vision equipment was returned prior to the expiration of the applicable four year license period. As a direct result of ITT's failures to comply with the requirements of the export licenses, ITT lost track of numerous pieces of state-of-the-art night vision equipment, and many of such pieces of night vision equipment were never recovered by the Company as required by law.

8

26.    In 2000, ITT sent several voluntary disclosure letters (the "Disclosure Letters") to the Department of State, where the Company stated that it had recently discovered apparent violations of the ITAR that involve ITT's loans and consignments of night vision equipment to foreign persons. In reliance on the Disclosure Letters, the Department of State had decided not to refer the ITT consignment issue to the United States Department of Justice, but had instead elected to combine the consignment violations and several other compliance violations into a single civil consent agreement that was executed on October 25, 2004 (the "Consent Agreement"). In violation of the Consent Agreement and to the detriment of the Company and its shareholders, ITT's employees intentionally withheld material facts, information and circumstances about the consignment violations from the United States Department of State in an effort to limit the potential penalties and consequences that might be imposed by the government.

**Illegal Exports to Singapore**

27.    In its Form 10-K for fiscal 2006 filed with the SEC on or about February 28, 2007, the Company publicly acknowledged that the United States Attorney for the Western District of Virginia is investigating ITT for its failure to comply with United States export control regulations, including ITAR. The Company further announced that it is negotiating a settlement with the government and has recorded a charge to net income of $25 million in the fourth quarter of 2006, its best estimate of the liability regarding these violations.

28.    Since the 1980's, ITT has purchased most of its night vision optical assemblies for use in the United States military night vision devices from a Singapore company ("Singapore Company"). Specifically, ITT routinely provided export-controlled technical specifications and drawings for United States military night vision devices to the Singapore Company, so that ITT

and the Singapore Company could work collaboratively to design and manufacture night vision optical assemblies.

29.    From 2000 onward, ITT sought approval from the United States Department of State for a Technical Assistance Agreement ("TAA") that would allow ITT to share certain specifically identified export-controlled technical data with the Singapore Company ("ITT/Singapore Company TAA"). The Department of State approved the ITT/Singapore Company TAA, but added a series of restrictive limiting provisions in light of the sensitive nature of the night vision optical technology. ITT, however, ignored these limitations and restrictions and continued to export controlled drawings and specifications to the Singapore Company that were not covered by the ITT/Singapore Company TAA or any export license. ITT further violated the ITT/Singapore Company TAA provisions by shipping hardware to the Singapore Company and by producing millions of dollars of product without legal authority.

30.    In July 2000, the United States Army awarded a development contract to ITT to study the "conceptual designs" for an Enhanced Night Vision Goggle System ("ENVG"), and subsequently to develop, build, and test prototype ENVG units. ITT, however, did not have a license to export ENVG documents to the Singapore Company and needed to get an amendment to the existing ITT/Singapore Company TAA if it wished to continue to collaborate with the Singapore Company on the ENVG design. ITT did not seek that amendment to the ITT/Singapore Company TAA, because it did not believe that it would meet the Department of State's approval. Despite the lack of a valid license to export ENVG drawings and specifications, ITT routinely exported drawings and specifications to the Singapore Company in violation of ITAR.

10

31.    In 2003, ITT began looking for a way to get around sending export-controlled ENVG technical data directly from ITT to the Singapore Company. In light of these concerns, an ITT manager wrote to the Singapore Company stating:

> I am sorry to say that I am extremely disappointed in the efforts so far to establish a domestic US operation and specifically to find an optical engineer. We are continuing to falter here in our efforts to re-design the ENVG optics while complying with US export regulations. This is forcing us to consider finding a US domestic source for ENVG optics and future optical assembly's [sic].

32.    The manager further stated that to keep its business with ITT, the Singapore Company needed to find a domestic engineer who would have to be employed by the Singapore Company's United States subsidiary. The Singapore Company hired an optical engineer who was a United States citizen (the "U.S. Engineer") and placed him with a sister company located near Rochester, New York (the "Rochester Company"). ITT circumvented the United States export laws by sharing technical data with the U.S. Engineer, who would subsequently export the technical data to the Singapore Company.

33.    The Rochester Company and its sister Singapore Company submitted a TAA ("Rochester/Singapore TAA"), which was approved by the United States Department of State with a series of limitations. Despite the fact that the Rochester/Singapore TAA was limited to the export of designs created by the Rochester Company, and with full knowledge that the Rochester/Singapore TAA was not specific and did not permit the transmittal of ITT's export-controlled ENVG drawings and specifications, ITT's management gave the U.S. Engineer approval to send the electronic version of export-controlled ENVG drawings to the Singapore Company.

11

34.    Throughout 2005 and early 2006, the U.S. Engineer, at the request and with approval of ITT, transmitted ITT's export-controlled up-to-date ENVG specifications and drawings to the Singapore Company without a license and in violation of the AECA and ITAR. As an ITT engineer stated in an email, the whole relationship between the Rochester Company and ITT was a "front" for an effort to get around the United States export laws.

35.    The U.S. Engineer was, in fact, an employee of the Singapore Company and not the Rochester Company. He was hired by the Singapore Company, supervised by Singapore Company personnel, his work was controlled and coordinated by the Singapore Company, and all expenses incurred by the Rochester Company in the support of the U.S. Engineer were completely reimbursed by the Singapore Company. As an employee of a foreign company, the U.S. Engineer had no right to export anything to the Singapore Company under the Rochester/Singapore TAA. ITT knew of these violations of law and facilitated them.

**Illegal Exports to Japan and China**

36.    Between September 2003 and December 2005, ITT, during its collaboration with a Japanese company (the "Japanese Company") in designing a unique ENVG switch (the "ENVG Switch"), exported sensitive and export-controlled information and drawings to Japan in violation of ITAR.

37.    During the final stages of the manufacturing, assembly and testing process of the ENVG Switch, the Japanese company used its sister company in China in an effort to reduce the cost of production. Despite being aware that China was a prohibited destination for export-controlled military items, ITT made no effort to prevent the Japanese company from exporting the ENVG switch designs to China. In fact, from 2003 until April 2006, all of the export-

12

controlled drawings and technical information illegally provided to the Japanese company were subsequently illegally transferred to China.

**The Truth Emerges**

38.    On March 26, 2007, the United States Attorney for the Western District of Virginia filed a three count criminal complaint against the Company (the "AG Complaint") based on a pattern of violations of the export laws of the United States spanning from the 1980's to 2006 at ITT, uncovered during the course of the criminal investigation by special agents of the United States Department of Defense and other government entities.  The AG Complaint alleges, among other things, that (1) between April 2000 and October 2004 ITT knowingly and willfully failed to state in required consignment-related reports that ITT was aware it was violating its export licenses for the temporary export or consignment of night vision goggles or night vision parts to foreign persons for years before informing the Department of State about the violations, and that ITT failed to take significant corrective action to stop the ongoing violations until shortly before it informed the Department of State about the violations; and (2) between January 1996 and May 2006 ITT knowingly and willfully exported and caused to be exported from the United States to China, Singapore and Japan, defense articles and other technical data, including drawings and specifications and defense services related to military night vision goggle systems, including the ENVG, without having first obtained from the Department of State a license for such exports or written authorization for such exports, in violation of the AECA and ITAR.

39.    The AG Complaint was filed pursuant to a contemporaneous plea agreement ("Plea Agreement") entered into between ITT and the United States.  As part of the Plea Agreement, ITT agreed to enter a plea of guilty to two of the three counts asserted in the AG

13

Complaint, pay the fines and special assessments of $2,000,800 on the date of the sentencing and a forfeiture money judgment of $28 million as a consequence of its guilty plea, and acknowledge that the United States had probable cause to bring all the counts in the AG Complaint. In addition, as part of its obligations pursuant to the Plea Agreement, ITT agreed to implement a remedial action plan, which includes, among other things, the establishment of an executive position within the Company responsible for ensuring ITT's compliance with all United States export laws and regulations, instituting compliance education/training program for its employees, establishing guidelines for expeditious reporting of losses of classified information, and conducting a complete inventory of all classified materials in the Company's possession.

40.    On March 27, 2007, Forbes.com reported that, in the first criminal conviction of a defense contractor under the AECA, ITT has pled guilty to the export of defense articles without a license and for making misleading statements in arms export reports. Specifically, multiple government bodies, including the Department of Defense, Homeland Security and the Department of Justice, found evidence that the Company "disseminated defense-related technical data to China, Singapore and the United Kingdom without notifying or obtaining approval from the State Department. ITT facilitated its illegal overseas exports by setting up a front company. There was also evidence that the company's night vision branch collaborated with foreigners on engineering projects and granted Chinese engineers access to the goggle system's design in Singapore." Under the agreement, ITT agreed to pay $50 million up front in penalties to the Department of State and the United States, including a $28 million forfeiture fee. The remainder of the $50 million fee will be suspended for five years as part of a deferred prosecution agreement.

41.    On March 28, 2007, The Wall Street Journal reported that under a plea deal with the Justice Department, ITT agreed to pay $100 million in penalties and admitted guilt to two counts of violations of the AECA. The article further reported that the criminal prosecution arose out of the Company's hope to pare costs and increase profits by outsourcing production of components for advanced night-vision equipment. Specifically, "ITT shared technical drawings and specifications for the components with a Singapore firm, which in turn farmed out some of the work to companies in China and Britain... [s]ome ITT managers viewed internal compliance officials, who warned them not to violate the federal export regulations, 'as obstacles to getting business done.'" The case is believed to be the first time a major defense contractor has admitted to criminal violations of the export control law. Pursuant to the article, ITT discovered its violations as early as mid-1990's, hid the extent of the problems and misled the government into believing it was fixing them. ITT officials tried to block the investigation after federal agents began their probe in 2001, in an attempt to "run out the clock" on the statute of limitations on some violations. The investigation continues into implicated Company employees.

## DERIVATIVE ALLEGATIONS

42.    Plaintiff brings this complaint derivatively in the right and for the benefit of ITT to redress injuries suffered and to be suffered by ITT as a direct result of the violations of fiduciary and other common law duties by the defendants to ITT and its public shareholders. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

43.    Plaintiff will adequately and fairly represent the interests of ITT and its public shareholders in enforcing and prosecuting their rights.

15

44.     Plaintiff has not made any demand on the Board of Directors of ITT to
institute this action because such demand would be a futile and useless act for the following
reasons:

     (i)     The ITT Board has proven itself to be unwilling to bring remedial action
against wrongdoers that have caused the Company substantial harm
regarding conduct of which the Board was aware. ITT was forced to pay a
fine of over $100 million to settle criminal litigation concerning its
violations of the Federal export laws. The ITT Board made no effort to
recover any of these damages from the known wrongdoers.

     (ii)     There was a sustained and systematic failure of the Board to exercise
oversight, in that the directors knew of the violations of law, took no steps
in an effort to prevent or remedy the situation, and that failure to take any
action for such an inordinate amount of time resulted in substantial
corporate losses. The directors' decision to not act was not made in good
faith and was contrary to the best interests of the Company;

     (iii)     The Board has made no effort to recover any portion of the fines levied
against it from the principal wrongdoers;

     (iv)     The acts complained of herein constitute criminal acts and violations of
fiduciary and common law duties owed by ITT's Board of Directors and
these acts are incapable of ratification;

     (v)     The defendants intentionally breached and/or recklessly and/or negligently
disregarded their fiduciary duties, choosing not to address the matters

16

raised by the AG Complaint, including ongoing violations of previously negotiated Consent Agreement. Although the Company was already the subject of government scrutiny, the defendants allowed the improper conduct to continue and failed to take appropriate remedial actions;

(vi)   The Board has failed to commence any action against the principal wrongdoers despite the lengthy passage of time since their criminal acts were revealed;

(vii)  The known principal wrongdoers are in a position to, and do, dominate and control the ITT Board of Directors, paying them high annual and monthly fees to assure their compliance. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(viii) The acts complained of herein are illegal and unreasonable and thus are incapable of ratification;

(ix)   In order to bring this action for breach of fiduciary and common law duties, the members of the ITT Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such actions; and

(x)    The members of the ITT Board of Directors, including each of the

defendants herein, receive substantial benefits, and other emoluments by

virtue of their membership on the Board and their control of ITT. Bring-

ing an action or even adequately investigating other directors, who have

the power to terminate a director's employment, would not likely occur.

The defendants are incapable of exercising independent objective

judgment in deciding whether to bring this action.

## COUNT I

### (Breach of Fiduciary Duties)

45.    Plaintiff incorporates by reference and realleges each and every allegation as set

forth above as if fully set forth herein.

46.    Each defendant owed ITT and its public shareholders the highest duties of loyalty,

honesty, and care in conducting their affairs.

47.    At a minimum, to discharge these duties, each defendant should have exercised

reasonable and prudent supervision over the management, policies, practices, controls and

financial affairs of ITT. By virtue of these obligations, each defendant was required, inter alia:

a.    to exercise reasonable control and supervision over the officers,

employees, agents, business, and operations of ITT;

b.    to be and remain informed as to how ITT was operating and, upon

receiving notice or information of an imprudent, questionable, or unlawful decision, condition, or

practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

18

c.    to conduct the affairs of ITT in a lawful manner and in compliance with government rules and regulations.

48.    The defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused the Company to commit illegal and criminal acts, waste its assets, and impair its reputation and credibility for no legitimate business purpose, as a result of which ITT has been and continues to be substantially damaged.

49.    Accordingly, plaintiff seeks on behalf of ITT monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT II

### (Indemnification)

50.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

51.    As alleged herein, the defendants, acting as officers and/or directors of ITT and, therefore, as its agents, breached their fiduciary duties to ITT and its public shareholders.

52.    ITT has suffered significant and substantial injury as a direct result of the defendants' knowing, intentional, or reckless breaches of their fiduciary duties as alleged herein. Plaintiff, on behalf of the Company, seeks relief from the defendants on the theory of indemnity for all such damages.

**WHEREFORE**, plaintiff prays for judgment as follows:

A.    Declaring that the defendants have breached their fiduciary duties as alleged herein;

B.　　Directing defendants, jointly and severally, to account for all losses and/or damages sustained by ITT by reason of the acts and omissions complained of herein and remit those sums to ITT;

C.　　Requiring defendants to remit to ITT all of their salaries, fees, stock awards, and other compensation received for the periods when they breached their duties;

D.　　Ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

E.　　Awarding pre-judgment and post-judgment interest as allowed by law;

F.　　Awarding plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

G.　　Granting such other and further relief as this Court may deem just and proper.

DATED:　July 11, 2007

STULL, STULL & BRODY

By: _____
　　　Jules Brody (JB-9151)
　　　6 East 45th Street
　　　New York, New York 10017
　　　(212) 687-7230

WEISS & LURIE
Joseph H. Weiss (JW-4534)
David C. Katz (DK-6235)
Ilya Nuzov (IN-1955)
551 Fifth Avenue
New York, New York 10176
(212) 682-3025

## **VERIFICATION**

I, Norman Levy, under penalty of perjury under the laws of the United States of America, declare as follows:

1.      I am the named plaintiff in the action herein.

2.      I have read the foregoing Verified Shareholder Derivative Complaint, know its contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief.

Executed this 25th day of June, 2007.

_____
Norman Levy